IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 20, 2019 Session

## STATE OF TENNESSEE v. JEMEL JOHNSON

**Appeal from the Criminal Court for Sumner County**
**Nos. 2011-CR-135, 2012-CR-231      Dee David Gay, Judge**

_____

### No. M2018-01346-CCA-R3-CD
_____

The Defendant, Jemel Johnson, was convicted by a Sumner County Criminal Court jury of two counts of attempted sexual battery by an authority figure, a Class D felony, two counts of aggravated rape, a Class A felony, and assault by extremely offensive or provocative conduct, a Class B misdemeanor, for acts involving two foster children. *See* T.C.A. §§ 39-12-101 (2018) (attempt); -13-101(A)(3) (2010) (subsequently amended) (assault); -13-502 (2018) (aggravated rape); -13-527 (2018) (attempted sexual battery by an authority figure). He received a sentence of twenty-five years' confinement. On appeal, the Defendant contends that (1) the trial court violated his constitutional right to due process by failing to produce a trial transcript sufficient to provide appellate review; (2) the evidence was insufficient to support his convictions for aggravated rape; (3) the trial court erred by admitting the victims' hearsay statements; (4) the trial court erred by allowing the State to cross-examination the Defendant's wife about her blaming the victims; (5) the trial court erred by not allowing the victims' school principal to testify about specific instances of conduct by one of the victims; (6) the trial court erred by questioning the Defendant's wife in an argumentative manner, resulting in prejudice to the Defendant; and (7) the trial court erred by failing to instruct the jury on sexual battery by an authority figure as a lesser included offense of aggravated rape. We affirm the judgments of the trial court and remand for entry of corrected judgments in Counts One and Two.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded for Entry of Corrected Judgments**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and JOHN EVERETT WILLIAMS, P.J., joined.

William L. Moore, Jr., Gallatin, Tennessee, for the appellant, Jemel Johnson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Brent Cooper, District Attorney General; and Beverly White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Sumner County grand jury indicted the Defendant for offenses that occurred on December 4, 2010, for sexual battery by an authority figure involving C.A.[1] in Count One, sexual battery by an authority figure involving L.P. in Count Two, rape by oral penetration of C.A. in Count Three, aggravated rape by penile penetration of C.A. in Count Four, aggravated rape by penile penetration of L.P. in Count Five, and aggravated rape of L.P. in Count Six in case number 2011-CR-135. Counts Three and Six were dismissed before trial. The grand jury also indicted with the Defendant for rape by oral penetration of C.A. in Count One in case number 2012-CR-231. The two cases were consolidated for trial.

At the May 7, 2012 trial, Beverly Cotten testified that she worked as a pediatric nurse at Our Kids Center in Nashville and that her primary duties included evaluating children concerning sexual abuse. Ms. Cotten explained that when a child victim was brought to Our Kids, the practice was for the victim to meet with a team consisting of a social worker and a nurse practitioner. The social worker would gather a medical and social history. The social worker would then discuss the collected information with the nurse practitioner, and the nurse practitioner would use those findings and conduct a physical examination of the victim. Ms. Cotten said that the type of information gathered included medical history, relevant medications, the type of sexual contact that had occurred, the areas of the victim's body that had been touched, and the areas of a victim's body that had touched someone else. Ms. Cotten would explain that the social worker would inform the victim about what would happen during the physical examination and that the nurse practitioner explained each step of the examination as it happened. Ms. Cotten said that her findings were put into a medical report. Ms. Cotten stated that physical examinations were sometimes conducted at a hospital.

Ms. Cotten testified that she examined C.A. and L.P. on December 5, 2010. Ms. Cotten identified the medical reports of C.A. and L.P., which contained Ms. Cotten's findings related to the physical examinations, and impressions and recommendations for C.A. and L.P. Ms. Cotten testified that C.A.'s medical report reflected penile-oral and penile-vaginal penetration.

Ms. Cotten testified that during the physical examination, she found a non-acute injury to C.A.'s hymen; however, it did not appear to be a result of "the current history that [C.A.] was giving." C.A. had no other acute injuries. Ms. Cotten testified that it was

---

[1] To protect the identity of minor victims and witnesses, we will refer to these individuals by their initials.

common for a patient with confirmed sexual contact to have a normal physical examination. Ms. Cotten said that she examined C.A. approximately twelve to fourteen hours after the alleged sexual contact and explained that the results of this examination did not mean that C.A. did not bleed or have painful urination before the examination. During C.A.'s examination, Ms. Cotten gathered a rape evidence collection kit, tested for sexually transmitted infections, and tested for pregnancy.

Ms. Cotten testified that she performed a physical examination on L.P. and found "fissuring" near L.P.'s genital area and that this type of injury might have caused a small amount of bleeding. Ms. Cotten said that she concluded L.P.'s injuries were consistent with sexual assault. During L.P.'s examination, Ms. Cotten gathered a rape evidence collection kit, tested for sexually transmitted infections, and tested for pregnancy. Ms. Cotten testified that all of the sexually transmitted infections and pregnancy tests conducted on the victims had negative results. The rape evidence collection kits for C.A. and L.P. were marked as exhibits and entered into evidence.

L.P. testified that she was age eighteen at the time of trial. L.P. stated that in March 2010, she began living with the Defendant and his wife, Peggy Johnson, after being placed there by the foster care system. L.P. said that when she first went to live with the Johnsons, she had trouble with her behavior and her grades. L.P. explained that she referred to the Defendant and Mrs. Johnson as "grandaddy" and "grandma," respectively. L.P. said that her relationship with the Johnsons was good and that they "were just like [her] parents." She said that before living with the Johnsons, she did not have a stable home life and that she felt as if the Johnsons were her biological parents. L.P. explained that they did things together as a family such as cookouts, trips to the park, playing games, going to church, and praying together. L.P. stated that she believed she had a positive future with the Johnsons and that they were going to adopt her. L.P. said that she was responsible for cleaning her room and that on Saturdays, she did chores at home. L.P. testified that she had lived with the Johnsons for approximately six months before C.A. began living there. L.P. said that she and C.A. eventually became close and that she called C.A. her "little sister." L.P. said she and C.A. spent time together talking in C.A.'s bedroom.

L.P. testified that on the morning of December 4, 2010, Mrs. Johnson was at work and the Defendant woke L.P. and instructed her to do her chores. L.P. said that she got up, ate breakfast, and soaked her feet in a bucket of water. She said that the Defendant approached her and asked her to wash his feet. L.P. said that she had not washed the Defendant's feet previously. L.P. explained that she filled the bucket with fresh water and that the Defendant began soaking his feet. L.P. said that she scrubbed the Defendant's feet and that C.A. helped. L.P. stated that while she and C.A. washed the Defendant's feet, the Defendant said that they "were going to hit a nerve." L.P. testified that the Defendant told the victims that they were "going to make it jump" and that he placed a pillow over his lap.

L.P. testified that the Defendant instructed her to retrieve his wallet. L.P. said that after she gave the wallet to the Defendant, he took out money and told the victims "to model" down the hallway. L.P. explained that she believed the Defendant was "just playing like always," so she walked like a model down the hallway. L.P. stated that after she walked down the hallway once, the Defendant told her to repeat her walk while wearing thong underwear. L.P. said that she told the Defendant she was tired and did not have thong underwear. L.P. said that C.A. stated she had thong underwear and that she and C.A. went into C.A.'s bedroom.

L.P. testified that after the bedroom door was closed, C.A. told L.P. that she was scared. L.P. said that she told C.A. not to be afraid because the Defendant was simply being funny. L.P. testified that she began looking through a drawer containing C.A.'s clothing and found a two-piece bathing suit that she liked. L.P. said that she tried it on, that C.A. tried on another bathing suit, and that as they looked at themselves in a mirror, the Defendant entered the bedroom. L.P. stated that the Defendant told her she had a model's body, that he grabbed her on top of her bathing suit, and that he attempted to remove her top. L.P. said that the Defendant grabbed L.P. and C.A. and "smushed" them together "like a sandwich." L.P. explained that the Defendant had one hand on C.A., that L.P. was standing in front of C.A., and that the Defendant placed his other hand on L.P. L.P. said that she felt the Defendant's hand on her back as he slid his other hand down C.A.'s body and that L.P felt the Defendant slide his hand down L.P.'s body. L.P said that the Defendant touched the top of her hairline under her bathing suit bottom. L.P. said that she could feel the Defendant's hand near C.A.'s "private area." L.P. said she slid to the floor, retreated to a corner of the room, and faced the wall. L.P. said that after a moment, she turned and saw the Defendant and C.A. on C.A.'s bed. She said that the Defendant was seated on the bed and that C.A. was "bent over" in front of him. L.P. said the Defendant smiled and hit C.A. on her bottom. L.P. testified that she saw C.A. lying on her back on her bed and that the Defendant's body was in between C.A.'s legs. She said that the Defendant's right hand was placed on C.A.'s leg and that L.P. could not see his left hand. L.P. said that she looked away and that when she looked up, the Defendant had left the room. L.P. said that she put on something to cover her swimsuit and left the room to continue with her chores. L.P. identified photographs of C.A.'s bedroom, which were received as exhibits.

L.P. testified that she went to the laundry room and put clothes into the washing machine. L.P. said that she returned to C.A.'s room and observed the Defendant leaving the room holding "something bloody in his hand." L.P. said that she heard him say he needed "to repent." L.P. testified that she went into C.A.'s bedroom and asked if C.A. were okay. She said that C.A. lay on her back on the bed and that L.P. lay on the bed on her stomach next to C.A. L.P. said that they were close enough for their skin to be touching. L.P. said that she hugged C.A. and that C.A. placed her head on L.P.'s shoulder.

L.P. testified that the Defendant returned and positioned himself on top of both L.P. and C.A. L.P. explained that he had his legs over both of the victims and placed a hand on each of the victim's necks. L.P. said that the Defendant attempted to push his penis into her vagina but that he was unable to do so because she had put her hands between her legs and clenched her muscles. L.P. said that the Defendant tried to enter her two or three times, that it was painful, and that she felt a lot of pressure between her legs. L.P. said the Defendant told her she was "too tight" and returned his attention to C.A. L.P. said that she saw the Defendant's and C.A.'s bodies moving in the mirror on the wall across from the bed. L.P. said she knew the Defendant and C.A. were having sex because of what she saw in the mirror and because she felt C.A.'s body moving.

L.P. testified that the Defendant returned his attention to her a second time and placed one of his legs in between her legs to open them and "pulled up" her body. L.P. explained that the Defendant put his penis inside of her vagina and that it was painful. She said he had his penis inside of her for a couple of minutes. L.P. said afterward, she was unsure if he went back to C.A. L.P. stated that the Defendant said he needed to shower and "repent." L.P. explained that she did not try to resist the Defendant during this incident because she was afraid that he might hurt her. L.P. said that this occurred early in the day. L.P. said that she got up from the bed, returned to her bedroom, and got dressed.

L.P. testified that C.A. entered L.P.'s bedroom. She said that both of them cried and that L.P. went into a closet and tried to call her boyfriend, K.J., to tell him about the incident. L.P. stated that she called K.J. multiple times but that he did not answer. L.P. said that she did not call Mrs. Johnson because she was afraid Mrs. Johnson would tell the Defendant and that she and C.A. were still alone in the house with the Defendant. L.P. testified that at some point after the incident, she used the bathroom. She explained that urination was painful and that she found a small amount of blood when she wiped.

L.P. testified that later that day, she went to the library with C.A. and the Defendant. L.P. explained that she did not tell anyone at the library about the incident because the Defendant was there. L.P. stated that they went to the laundromat after leaving the library and then returned home. L.P. said that Mrs. Johnson was home when they arrived. L.P. said that the Defendant and Mrs. Johnson went into their bedroom and that L.P. went into her own bedroom and tried to call K.J. again. L.P. estimated she called him around 3:00 p.m. She said that he answered, that she told him what had happened with the Defendant, and that she asked him to come over to her home. L.P. said that she did not call the police because she first wanted to tell Mrs. Johnson.

L.P. testified that while she waited on K.J. to arrive, she and C.A. were in the den. L.P. said she was waiting on an opportunity to tell Mrs. Johnson what had happened but that Mrs. Johnson did not come out of the bedroom. L.P. stated that K.J. arrived at

approximately 5:00 p.m. and that they remained in the den. L.P. said she gave her cell phone to C.A. and that C.A. took the phone and went into C.A.'s bedroom. L.P. said that a few minutes later there were knocks on the front door. L.P. said that C.A. ran to the door and that L.P. joined her when she saw C.A. running. L.P. stated that two detectives and one police officer were outside the door. L.P. explained that she and C.A. ran out of the home onto the driveway and began crying. L.P. said that she cried because she knew she would have to leave the Johnsons' home and that she felt as if she should have done something to stop the Defendant, such as calling Mrs. Johnson or the police. L.P. said she gave a statement to the detectives that night.

On cross-examination, L.P. denied that C.A. "started all the sex stuff" in order for C.A. to get the Defendant in trouble and to be placed in a different school. L.P.'s sworn statement of April 27, 2012, was received as an exhibit and portions of which were read to the jury as follows:

- [C.A.] started all the sex stuff that happened at the Johnsons' house on December 4, 2010.
- [C.A.] wanted to get [the Defendant] in trouble so she could go to another foster home and a new school. She did want to go to [her current high school].
- [C.A.] tried to get [the Defendant] to have sex with her so he would get in trouble and she could leave.
- [C.A.] told [L.P.] that the night before, December 3, 2010, about her intentions and how she planned to get [the Defendant] in trouble with sex.
- [L.P.] wanted [C.A.] to leave so [L.P.] went along with her. Everything got out of hand.

L.P.'s sworn deposition testimony of August 17, 2011, was likewise read to the jury, which reflected the following:

Q:   Did you ever see [the Defendant] do anything to [C.A.]?
A:   No.
Q:   And you were right there in the room – [C.A.] was in the room with you when [the Defendant] was in the room, right?
A:   Yes.
Q:   [The Defendant] didn't use his position of authority or as a foster parent to do anything that happened that day, did he?
A:   No.
Q:   At any time during that day did [the Defendant] cause you any kind of bodily injury?
A:   No.

Q: Other than grabbing your arms, did he use force or coercion to threaten you with anything to do with what had happened, whatever happened that day?

A: No.

Q: [The Defendant] didn't ever use his position as a foster father, supervising you, to accomplish anything bad that happened that day, did he?

A: No.

Q: Did [the Defendant] cause, from what you could see, any bodily injury to [C.A.]?

A: No. She was already bleeding.

Q: Has anybody promised you anything for coming here and talking with me today?

A: No, nobody promised me.

Q: Has anybody coerced you to [give a statement]?

A: No.

Q: You've done this of your own free will?

A: Yes.

Q: [A] lot of this stuff after talking to the police and after talking to the lady at the hospital and talking to the people at Our Kids, a lot of this got blown out of proportion, didn't it?

A. Things had gotten confused, yes, they did.

L.P. said that the deposition she gave on August 17, 2011, was not of her own free will. L.P. explained that Mrs. Johnson took her to defense counsel's office to make the deposition.

On redirect examination, L.P. testified that after leaving the Johnsons' house, she lived in another foster home until June 2011, and she "aged-out" of the foster system on July 5, 2011. L.P. stated that she was pregnant at that time and would have been approximately three months' pregnant when she met with defense counsel on August 17, 2011. L.P. said that when she told Mrs. Johnson about the pregnancy, Mrs. Johnson told L.P. that she wanted L.P. to come live with her. L.P. stated that Mrs. Johnson told her she wanted to help take care of L.P. and the baby. L.P. said that this did not happen, and L.P. lived with Mrs. Johnson's daughter for a while instead. L.P. said that Mrs. Johnson called her, informed her that the defense attorney was going to call her, and took L.P. to the attorney's office on August 17, 2011. L.P. said that Mrs. Johnson and Mrs. Johnson's daughter took her to the defense counsel's office on April 27, 2012, at which time she gave her sworn deposition to defense counsel. L.P. stated that her trial testimony was truthful. L.P. testified that after making her statement to police on the evening of the incident, she saw a doctor.

C.A. testified that she was age sixteen at the time of the trial and that she had been placed in the Defendant's home through the foster care system. C.A. stated that she enjoyed living with the Defendant and Mrs. Johnson and that their home was the best foster home she had experienced. She said that she tried new foods, attended church, and had reasonable chores. C.A. said that she called Mrs. Johnson "grandma" and called the Defendant "granddaddy." C.A. stated that when she first moved into the home, she and L.P. did not get along. C.A. explained that once she and L.P. began speaking to each other and getting to know one another, they became close. C.A. said that she viewed the Defendant and Mrs. Johnson as her parents and L.P. as her big sister.

C.A. testified that on weekends, she and L.P. performed household chores. C.A. said that one day, approximately two weeks after she began living with the Johnsons, she got on the wrong school bus and spent the night at a friend's home. C.A. explained that she was told she would be sent to a group home if she did this again and that she decided she would not run away again. C.A. said that after this incident, she had no other problems with the Johnsons until December 4, 2010.

C.A. testified that on the morning of December 4, 2010, she was at home with the Defendant and that Mrs. Johnson had gone to work. C.A. said that the Defendant approached her in the hallway near the bathroom and said, "Suck my dick." C.A. said that she attempted to get away from the Defendant but that he grabbed the back of her neck, pushed her head down, and forced his penis into her mouth. C.A. said that her neck was red and sore afterward and that she saw the Defendant go into the bathroom to masturbate.

C.A. testified that after this incident, she awakened L.P. at the Defendant's request. C.A. said she did not tell L.P. what had happened previously with the Defendant because C.A. was scared and did not want to be separated from L.P. C.A. said that she did not want to be removed from the Johnsons' home. C.A. stated that L.P. went into the living room and scrubbed L.P.'s feet. C.A. said that when L.P. scrubbed her feet, the Defendant entered the living room and asked L.P. to scrub his feet. C.A. said that while L.P. scrubbed the Defendant's feet, he held a pillow and began singing "the temperature is rising." C.A. said that the Defendant asked her and L.P. if they would ever tell anyone if he did something. C.A. said that he also asked if they would tell anyone if he gave them money. C.A. said that she and L.P. replied, "No."

C.A. testified that the Defendant then asked her and L.P. to "model walk" down the hallway. C.A. said that she and L.P. stood and walked into C.A.'s bedroom. C.A. explained that she needed to change clothes because she planned to go to the laundromat and to the library that day. C.A. said that before getting dressed, she and L.P. tried on two-piece bathing suits. C.A. testified that while she and L.P. were trying on bathing suits, the Defendant entered the bedroom without knocking. C.A. said that the Defendant started touching her and L.P. C.A. stated that he grabbed at her breasts and her bottom

-8-

and that he grabbed at L.P. in a similar manner. C.A. said that she tried to back away from the Defendant but tripped and fell onto the bed. C.A. stated the Defendant repeatedly said, "I have to repent." C.A. said that after she fell, the Defendant left the room. C.A. explained that L.P. lay down on the bed beside her, close enough to touch C.A.

C.A. testified that the Defendant returned to the bedroom a few minutes later. C.A. said the Defendant carried cut-off fingers from a glove and that he placed a piece of glove onto his penis. C.A. explained that she lay on her back on the bed and that the Defendant climbed onto the bed. C.A. said she rolled onto her stomach, and the Defendant placed one arm and one leg on top of her. C.A. stated that she could not see what happened with L.P. because C.A. was facing the wall but that she heard noises. C.A. said that the Defendant made comments such as "I know you like this." C.A. said that after the Defendant finished with L.P., he got on top of C.A. and tried to put his penis inside of C.A. but that "it wouldn't go in." C.A. said that this was painful.

C.A. testified that after failing to penetrate her, the Defendant got off the bed and left the room. She said that he returned and climbed on top of L.P. a second time. C.A. stated that she did not know what happened next because she was scared and faced the wall. C.A. stated that the Defendant got on top of her a second time and attempted to penetrate her with his penis. C.A. said that he "rammed his penis" into her vagina and that she felt "throbbing" and "ripping." She also said that she felt "sharp pain" and explained that "it was hard for me for me to breathe." C.A. explained that before this incident with the Defendant, she had not started menstruation and had not had vaginal pain. C.A. said that when the Defendant finished, he walked out of the room.

C.A. testified that the Defendant carried the glove finger he had placed on his penis and that the tip was covered in blood. C.A. identified a photograph of a glove finger with dried blood on the tip and said it looked like the one the Defendant used.

C.A. testified that after the Defendant left C.A.'s bedroom, C.A. and L.P. went into L.P.'s bedroom. She said that L.P. hid in the closet and called K.J., who did not answer. C.A. explained that she was afraid, sat on the bed, and cried. C.A. said that she, L.P., and the Defendant went to the library and the laundromat, though she could not remember where they went first. C.A. stated that the Defendant was with her at all times and that she did not have an opportunity to tell anyone about what had happened that morning. C.A. said that when they returned home, Mrs. Johnson was home from work. C.A. explained that she did not tell Mrs. Johnson what had happened because Mrs. Johnson was in a bad mood. C.A. said that K.J. did not answer his phone until after C.A., L.P., and the Defendant returned from the library. C.A. stated that K.J. came to the home at some point that evening. C.A. said that she used L.P.'s phone to call her biological mother. C.A. said that she told her mother about what had happened with the Defendant.

C.A. stated that her mother hung up the phone and called back a few minutes later to inform C.A. that detectives were on their way to the Johnsons' home.

C.A. testified that detectives arrived at the Johnsons' home approximately thirty to forty-five minutes after she spoke to her mother. C.A. said that as soon as the detectives arrived, C.A. and L.P. ran outside. C.A. explained that she felt relieved but was scared the detectives would not believe her. C.A. testified that she was put in one of the police cars and that she wrote a statement about what had happened. C.A. said that she and L.P. went to the police station and talked with people there and that after the police station, she and L.P. went to a hospital.

On cross-examination, C.A. testified that she wrote in her police statement that the Defendant "[c]ame in there, and he made me suck his dick in the hallway . . . . [Then] I was, I mean, I didn't know what to do, so I just did it." When asked why she did not mention the Defendant's grabbing her and pushing her head down, C.A. stated that this was the first time she had been interviewed, that she did not want to describe everything, and that she did not remember every detail. C.A. said that while writing the statement she was "shocked." C.A. said she had not wanted to be moved to a group home. C.A. stated she was the first person to inform the detectives about the pieces of glove found in a trash can. She testified that she had seen the glove in a yellow bag inside the trash can and told the detectives where to find it. On redirect examination, C.A. testified that she had not wanted to leave the Johnsons' home before the incident and that she did not plan to have sexual contact with the Defendant.

Hendersonville Police Department (HPD) Detective Seneca Smith testified that he assisted Detective Jim Bachman in investigating this case. Detective Smith recalled that the victims ran out of the home when he approached the front door of the home. He said that the victims cried and appeared frightened. Detective Smith testified that he interviewed L.P. in his car while Detective Bachman interviewed C.A. in Detective Bachman's car. Detective Smith thought initially that L.P.'s statement was "far-fetched" but that after comparing notes with Detective Bachman about C.A.'s statement, L.P.'s statement appeared credible because it was consistent with C.A.'s statement. Detective Smith said that he questioned L.P. regarding his doubts, and L.P. insisted that she was not lying.

Detective Smith testified that after speaking with L.P. and discussing C.A.'s statement with Detective Bachman, he went into the home. Detective Smith said he spoke with Mrs. Johnson and L.P.'s boyfriend in the living room. Detective Smith said that Detective Bachman spoke with the Defendant in the kitchen. Detective Smith said that he was positioned to see into the kitchen. He said that he observed the Defendant lean across the table and say, "Lord, Jesus, help me."

Detective Smith testified that the Defendant and Mrs. Johnson consented to a search of the home. Detective Smith said that during the search, C.A.'s bedroom was

photographed and a sheet from her bed was seized. He stated that outside they searched a trash can and a portion of a glove, a glove, and a tissue or paper towel were seized. Detective Smith said that the items were found inside a yellow plastic bag. Detective Smith identified the items, which were received as exhibits.

Sandra Gonzalez, a licensed clinical social worker at Our Kids, testified that she interviewed L.P. and C.A. separately before their medical examinations. Ms. Gonzalez said that she informed L.P. and C.A. that the questions she asked them were for the purpose of medical diagnosis and treatment. Ms. Gonzalez explained that she often asked teenage victims what had happened in the past twenty-four hours. Ms. Gonzalez said that she did this with C.A. and L.P. and that she provided the information to the nurse practitioner who performed their medical examinations. Ms. Gonzalez identified the report she dictated following her interview of C.A.

Ms. Gonzalez testified that she interviewed C.A. Ms. Gonzalez stated that C.A. told her that there had been an incident in C.A.'s foster home. Ms. Gonzalez said that C.A. explained with whom she lived and for how long she had lived there. Ms. Gonzalez said that she asked C.A. what had happened over the past few hours that might have led to C.A.'s being treated at the hospital. Ms. Gonzalez said C.A. stated that the Defendant told C.A. to "suck his dick," that C.A. told him no, that the Defendant pushed C.A.'s head down toward the Defendant's penis, and that the Defendant put his penis in C.A.'s mouth. Ms. Gonzalez said C.A. told her that C.A. walked into the living room where L.P. was washing L.P.'s feet, that the Defendant instructed C.A. and L.P. to walk like a model down the hallway, that C.A. and L.P. tried on bathing suits, that the Defendant placed a finger of a latex glove on his penis, and that the Defendant put his penis into C.A.'s vagina. Ms. Gonzalez said C.A. informed her that the Defendant "took turns" having sex with C.A. and L.P. by holding down one victim while having sex with the other on the same bed. Ms. Gonzalez said C.A. told her that the Defendant took C.A. and L.P. to the library following the incident. Ms. Gonzalez stated that C.A. said she was able to call her biological mother at approximately 5:00 p.m. and that C.A. told her mother what had happened. Ms. Gonzalez stated that C.A. said that sexual contact by the Defendant had not occurred before this day. Ms. Gonzalez said C.A. reported experiencing pain and bleeding following the incident.

Ms. Gonzalez testified that after she completed the medical history with C.A., she took C.A. into an examination room and explained the examination procedure. Ms. Gonzalez said that nurse Beverly Cotten entered the room and began C.A.'s examination. Ms. Gonzalez said that she remained in the room during C.A.'s examination and assisted Ms. Cotten in collecting a rape kit. Ms. Gonzalez testified that she went through the same process with L.P. Ms. Gonzalez identified her reports regarding the victims' medical histories, and the reports were received as exhibits.

Ms. Gonzalez testified that L.P. stated during the interview that she went into the living room where the Defendant was sitting on a couch, that she scrubbed her feet, that the Defendant asked L.P. to scrub his feet, and that L.P. complied with his request. Ms. Gonzales said that L.P. explained that while she was scrubbing the Defendant's feet, the Defendant indicated he felt something and that he placed two pillows on his lap. Ms. Gonzalez said that L.P. said the Defendant offered her money if she would walk like a model down the hallway, that L.P. thought this was amusing, that L.P. walked down the hallway, and that the Defendant instructed L.P. to walk while wearing thong underwear. Ms. Gonzalez said L.P. reported that the Defendant grabbed L.P. and C.A. near their breasts and attempted to put his hand in L.P.'s pants. Ms. Gonzalez stated that L.P. explained that L.P. and C.A. were in C.A.'s bedroom trying on clothes and bathing suits when the Defendant entered the bedroom. Ms. Gonzalez said L.P. told her that L.P. and C.A. were both on the bed, that the Defendant got on top of both girls, that the Defendant had sex with L.P., and that the Defendant placed the fingertip of a latex glove on his penis but did not use a condom. Ms. Gonzalez stated L.P. explained that afterward, she used the restroom, experienced pain, and realized she was bleeding. Ms. Gonzalez said L.P. reported that this was the first incident of sexual contact with the Defendant.

K.J. testified that he was L.P.'s then-boyfriend and that he had spent time with L.P. at the Johnsons' home. K.J. said that L.P. cared about the Johnsons and viewed them as her grandparents. K.J. recalled that on December 4, 2010, he spoke with L.P. on the phone. He said that she had attempted to call him several times but that he had been asleep after working "third shift." K.J. said that he had missed approximately ten to fifteen calls from L.P. K.J. said that when he answered his phone, he knew something was wrong because L.P. was crying and that she explained what had happened with the Defendant. K.J. said that he also heard C.A. crying because L.P. used the speaker phone setting. K.J. stated that after that phone call, he went to the Johnsons' home. K.J. said that he arrived at the home at approximately 3:00 p.m., that L.P., C.A., Mrs. Johnson, and the Defendant were there, and that L.P. was scared but tried to hide her fear. K.J. said L.P. was shaking. K.J. testified that C.A. also was afraid. K.J. said that the Defendant acted normal and that K.J. played a video game with him. K.J. said that at some point during his visit, he was alone with L.P. and C.A. and that he encouraged them to call the police. K.J. said that C.A. borrowed his cell phone, used the phone to call her mother, and that the police became involved. K.J. stated that when the police arrived at the Johnsons' home, L.P. and C.A. ran outside and cried. K.J. said that he went outside with the victims to calm them and keep them company. K.J. stated that he also accompanied the victims to the police station.

HPD Detective Jim Bachman testified that on December 4, 2010, he, along with Detective Smith, investigated allegations of child rape at the Defendant's home. Detective Bachman said that he knocked on the door and that the two victims ran out of the home. Detective Bachman said the victims cried and did not want to go back into the home. He stated that he instructed the victims to wait outside with another officer, while

he went inside the home and spoke with the Defendant and Mrs. Johnson. Detective Bachman testified that K.J. was also present. Detective Bachman said that he went back outside to talk with the victims. He said that he spoke to C.A. in his car while Detective Smith spoke to L.P. in Detective Smith's car.

Detective Bachman read the following statement from a transcript in which he asked C.A. what had happened that day: "[The Defendant] came in there, and he made me suck his dick in the hallway." Detective Bachman also read the following passage from C.A.'s statement to him:

> I was, like, what should I do? I was, like, why? He was, like, just do it. I was, like, and I just did it. And I was, you know, I was shaking and stuff. And then I was, like, why am I – I took it out of my mouth, and he kept pushing my head.

Detective Bachman testified that he spoke with the Defendant in the kitchen. Detective Bachman said that he told the Defendant he was there to talk to the Defendant about activity that had occurred with L.P. and C.A. earlier in the day. Detective Bachman stated that during the interview, he asked the Defendant if he engaged in consensual activity with L.P. and C.A. Detective Bachman said that the Defendant did not speak but provided "an affirmative response." Detective Bachman explained that he "soften[ed]" the interview in order to obtain truthful responses from the Defendant. Detective Bachman testified that he asked the Defendant about the glove and that the Defendant said he cut off the fingertip, used it as a condom, and flushed it down the toilet. Detective Bachman stated that when he asked the Defendant if the Defendant had sexual intercourse with L.P. and C.A., the Defendant said that he tried but that L.P. and C.A. were "too small." Detective Bachman said the Defendant also told him that the Defendant did not have any sexually transmitted infections that he might have given to L.P. and C.A. and that it was impossible for L.P. or C.A. to have been pregnant. Detective Bachman stated that the Defendant became emotional and repeated phrases such as "the flesh got the best of me," and "I got to repent." Detective Bachman testified that the Defendant asked to speak with Mrs. Johnson and that the Defendant told Mrs. Johnson that both L.P. and C.A. were on C.A.'s bed when he tried to have sex with them. Detective Bachman said that the Defendant repeatedly said he "needs forgiveness and to repent."

Detective Bachman testified that he arrested the Defendant and obtained a DNA sample for Tennessee Bureau of Investigation (TBI) analysis. The Defendant's DNA sample was received as an exhibit.

On cross-examination, Detective Bachman agreed that the Defendant's statement did not refute the defense theory that C.A. initiated the sexual contact with the Defendant in order to get the Defendant in trouble.

TBI Special Agent Jennifer Shipman testified as an expert forensic scientist specializing in serology and DNA. She stated that C.A.'s vaginal swabs, anal swabs, and underwear did not reveal the presence of semen. Agent Shipman stated that L.P.'s vaginal and anal swabs did not reveal the presence of semen. Agent Shipman said that her examination of the finger of the latex glove collected from the Defendant's home revealed the presence of sperm and blood cells. Agent Shipman explained that she separated the sperm from the blood on the glove and conducted DNA testing on the sperm and the blood. Agent Shipman stated that the sperm on the glove matched the Defendant's DNA profile and that the blood matched C.A.'s DNA profile. Agent Shipman stated that her examination of the paper towel collected from the Defendant's home revealed the presence of blood, matching C.A.'s DNA profile.

Peggy Johnson testified that she was the Defendant's wife. She stated that L.P. came to live in their home in March 2010 and that there were no difficulties with L.P. Mrs. Johnson testified that once C.A. began living in the home, there were problems. Mrs. Johnson said that C.A. had behavioral problems and that Mrs. Johnson told C.A. if her behavior did not improve, Mrs. Johnson would have her removed from the home. Mrs. Johnson said that she told C.A. that if C.A. were removed, C.A. would be placed in a group home. Mrs. Johnson stated that she observed L.P. and C.A. whispering to each other the night before the incident and that she confronted the girls and informed them she knew they were plotting something.

Upon examination by the trial court, Mrs. Johnson testified that the girls' whispering raised her suspicions that they were plotting something because this was something that L.P. and C.A. had done previously. Mrs. Johnson stated that she was at work on the day of the incident and arrived home at approximately 12:45 p.m. Mrs. Johnson said that L.P. and C.A. left the home that evening. Mrs. Johnson stated that L.P. called her in February 2011, asking if she could attend church with Mrs. Johnson, but Mrs. Johnson declined. Mrs. Johnson said that L.P. called her again in May 2011 to inform Mrs. Johnson that L.P. wanted to return home, but Mrs. Johnson told L.P. that would be impossible.

Mrs. Johnson testified that on the evening the police came to her home, she went into the kitchen with the Defendant and Detective Bachman. Mrs. Johnson said the Defendant told her that earlier in the day C.A. came out of her bedroom wearing only underwear, that the Defendant told C.A. to put on more clothes, that C.A. went into L.P.'s bedroom instead, and that both girls walked into the living room wearing only bathing suits. Mrs. Johnson said that the Defendant was hysterical and that she used holy oil to anoint him and prayed for him. Mrs. Johnson said that she did not pressure L.P. to give a sworn statement to defense counsel and to sign the affidavit. Mrs. Johnson explained that L.P. told Mrs. Johnson that she did not want to sign the affidavit and that Mrs. Johnson wrote the affidavit and gave it to L.P. to sign.

Cathy Groves testified that she was a registered foster parent. Ms. Groves said that C.A. lived as a foster child in her home beginning in late 2010. Ms. Groves testified that C.A. was not trustworthy. On cross-examination, Ms. Groves further explained that lying was a problem for C.A. Ms. Groves said that she did not have any personal knowledge of this case and did not know whether C.A. was raped.

Aaron Mulligan testified that he was the assistant principal at C.A.'s high school and that he was responsible for discipling C.A. when she attended the school. Mr. Mulligan said that he had frequent interactions with C.A. regarding her behavior. Regarding C.A.'s character for truthfulness, Mr. Mulligan testified that he would "usually not" believe C.A.'s statements, even if she gave sworn testimony. Mr. Mulligan said that C.A. had been known to manipulate the truth to obtain a desired outcome. On cross-examination, Mr. Mulligan stated that C.A. was sometimes truthful.

Upon this evidence, the jury convicted the Defendant of two counts of attempted sexual battery by an authority figure as a lesser included offense of sexual battery by an authority figure and two counts of aggravated rape in case number 2011-CR-135. The jury likewise convicted the Defendant of assault as a lesser included offense of rape in case number 2012-CR-231. This appeal followed.

## I.    Due Process Regarding Sufficiency of the Trial Transcript

The Defendant argues that he was denied a sufficient transcript of the evidence in violation of his constitutional right to due process. He argues that the transcript contains too many errors to be a true and accurate transcript of the trial. Additionally, he asserts that the court reporter's audio recordings of the trial were not filed with the trial court clerk, properly stored, and properly backed up. The State responds that the transcript is sufficient for appellate review. The State argues that any errors do not sufficiently undermine the accuracy of the transcript that would warrant a new trial on principles of due process.

"A citizen has the right to due process of law under the Fourteenth Amendment to the United States Constitution and under the 'law of the land' provision of article I, section 8 of the Tennessee Constitution." *State v. Culbreath*, 30 S.W.3d 309, 317 (Tenn. 2000).

Tennessee Rule of Appellate Procedure 24(f) regarding the approval of the record by a trial court judge states the following:

> The trial judge shall approve the transcript or statement of the evidence and shall authenticate the exhibits as soon as practicable after the filing thereof . . . . Otherwise the transcript or statement of the evidence and the exhibits shall be deemed to have been approved and shall be so

considered by the appellate court, except in cases where such approval did not occur by reason of death or inability to act by the trial judge.

The transcript in this case was approved by the judge to be an accurate depiction of the statements made by the parties and the judge at the evidentiary hearing. *See* T.R.A.P. 24(f). The transcript contains multiple spelling and grammatical errors; however, the errors do not create an ambiguity in the substance of witness testimony, statements by counsel, and statements by the trial court. Moreover, the Defendant cites to no authority that errors in a certified transcript create a due process violation. We conclude that the transcript is sufficient for appellate review, and the Defendant is not entitled to relief regarding this issue.

## II. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions for aggravated rape. He argues that his convictions for two counts of the lesser included offense of attempted sexual battery by an authority figure and his conviction for the lesser included offense of assault were inconsistent with his two convictions for aggravated rape. He also asserts that the evidence was insufficient to establish bodily injury to the victims. Specific to the aggravated rape of C.A., the Defendant argues that the medical examination did not reflect "objective findings of injury." Regarding the aggravated rape of L.P., the Defendant argues that although the medical examination showed some injuries, the injuries were not connected directly to him. The State responds that the evidence is sufficient to support the Defendant's convictions for aggravated rape. The State argues the testimony from the victims that they suffered pain during the incidents was sufficient to establish bodily injury. The State argues that the verdicts are not inconsistent and that appellate courts do not usurp a jury verdict even when that verdict appears inconsistent.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see State v. Vasques,* 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques,* 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall,* 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton,* 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same

whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes,* 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson,* 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-13-502 provides in relevant part that "[a]ggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by" "bodily injury to the victim." Bodily injury "includes a cut, abrasion, burn or disfigurement, and physical pain or temporary illness or impairment of the function of bodily member, organ or mental faculty[.]'" T.C.A. § 39-11-106(a)(2).

Here, there is sufficient evidence to support the Defendant's convictions for aggravated rape. L.P. and C.A. each testified that the Defendant vaginally penetrated them. L.P. explained that the Defendant held her and C.A. down on the bed and took turns penetrating them. L.P. explained that she did not resist the Defendant because she was afraid he would harm her. C.A. also testified that the Defendant held her and L.P. down on the bed and took turns penetrating her and L.P. C.A. stated that she observed the Defendant place the finger of a latex glove on his penis before penetrating her and L.P. C.A. said that after the Defendant penetrated her and L.P., she saw the glove finger and that it appeared to have blood on it. A bloodied glove finger was found by investigating officers, and, after testing, the sperm on the glove finger matched the Defendant's DNA profile and the blood on the glove finger matched C.A.'s DNA profile.

Specifically regarding the element of bodily injury, each victim testified that she felt pain when the Defendant vaginally penetrated her with his penis. LP stated that after the Defendant penetrated her, she had pain during urination and discovered blood upon wiping. Moreover, Ms. Cotten testified that L.P. had a fissure near her genital area, an injury consistent with sexual assault. C.A. explained that "it hurt, it felt like it was throbbing and it was ripping" and that she felt "a sharp pain." Thus, there is sufficient proof of bodily injury to C.A. and L.P. We conclude that the evidence is sufficient to support the Defendant's convictions for aggravated rape. The Defendant is not entitled to relief on this basis.

Regarding inconsistent jury verdicts,

[c]onsistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment. Therein lies the essential reasoning. An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction. This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

*Wiggins v. State*, 498 S.W.2d 92, 93-94 (Tenn. 1973); *see State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015) (holding that "inconsistent jury verdicts are not a basis for relief.")

The Defendant's argument that the jury's verdicts are inconsistent is without merit.  Each count was a separate act, and the jury was instructed as follows: "The crime charged in each count of the indictment is a separate and distinct offense.  You must decide each charge separately on the evidence and the case law applicable to it."  Regardless, inconsistency is not a basis for relief.  *See Davis*, 466 S.W.3d at 77; *see also Wiggins*, 498 S.W.2d at 93-94.  The Defendant is not entitled to relief regarding this issue.

### III.    Hearsay Regarding the Victims' Statements

The Defendant argues that the trial court erred (1) by allowing Ms. Cotten to testify about what Ms. Gonzalez told her regarding the victims' medical histories, (2) by allowing Ms. Gonzalez to testify about what the victims told her during her interviews with them, and (3) by admitting as evidence the victims' Our Kids medical reports prepared by Ms. Cotten and Ms. Gonzalez because they contained inadmissible hearsay and were unduly prejudicial.  He argues that the statements contained within the victims' medical reports were not for the purposes of medical diagnosis and treatment.  The Defendant also argues that the admission of the victims' medical reports violated the Confrontation Clause by "recording the victims' testimony without giving the Defendant an opportunity to cross-examine."  The State responds that the trial court did not err by allowing as evidence the victims' statements because the statements were not inadmissible hearsay.  The State also argues that the Defendant questioned the victims' credibility by introducing L.P.'s affidavit; thus, the victims' statements would have been admissible as prior consistent statements for rehabilitation purposes.

A jury-out hearing was held to determine whether Ms. Cotten was qualified to testify as an expert in child sexual abuse.  The trial court ruled that Ms. Cotten was allowed to testify as an expert pediatric nurse practitioner or examiner.  Defense counsel also objected to any testimony regarding the victims' medical history.  During the hearing, Ms. Cotten explained that she conducted the physical examinations of the victims but that a licensed social worker, Sandra Gonzalez, collected medical histories from the victims.  Ms. Cotten said that Ms. Gonzalez did not diagnose the victims.  Ms. Cotten explained that Ms. Gonzalez gave the collected medical histories to Ms. Cotten and that these histories were a standard part of her medical forensic examination.  She stated that she used the medical histories to guide the physical examinations and that the two could not be separated.  Ms. Cotten explained that her job was to medically diagnose and treat patients and not to determine whether the sexual contact was forcible or coercive.  Ms. Cotten testified that knowing the identity of the alleged perpetrator helped her to develop a safety plan and was relevant for determining if the victims had been

exposed to sexually transmitted infections or if there was a possibility the victims could have been pregnant.

Defense counsel reiterated his objection to Ms. Cotten's testimony based on Tennessee Rule of Evidence 803(4). Defense counsel argued that the type of sexual conduct was inadmissible hearsay because it was not relevant for Ms. Cotten's medical diagnosis and treatment of the victims. The trial court ruled that Ms. Cotten was allowed to testify regarding statements made for the purposes of medical diagnosis and treatment. After the jury returned, Ms. Cotten testified about the circumstances of her examination of C.A. and said C.A. "came in with a history [of] penile/oral and penile/vaginal penetration." The trial court then gave the following instruction:

> Now, ladies and gentlemen, that testimony that you just heard is to be considered by you only for purposes related to medical diagnosis and treatment relating to the hearer of that, the witness here, Ms. Cotten. They are not to be considered by you as to whether or not there was an aggravated rape or rape.

Ms. Gonzalez testified that she would discuss the child's specific medical concerns and gather information regarding the incident of potential sexual abuse. Ms. Gonzalez explained that the purpose of gathering this information was related to the safety of the child. Ms. Gonzalez testified that she asked the child questions regarding medical history and any physical problems the child might be experiencing. Ms. Gonzalez explained that she asked the identity of the perpetrator of any sexual offense in order to determine if the child was at risk for certain things, such as sexually transmitted infections. Ms. Gonzalez said that knowing if a child had been exposed to a sexually transmitted infection informed the type of testing and treatment a child received. Ms. Gonzalez specified that if sexual abuse was a concern regarding a child, she asked if that child were experiencing pain and asked what brought the child to the clinic. Ms. Gonzalez said that the emotional impact of the incident was also relevant to treatment of the child. Ms. Gonzalez stated that all of these questions were related to a child's medical history. Ms. Gonzalez said that she provided this collected information to a nurse practitioner, who then completed a medical examination on the child.

### A. Statements Made for Medical Diagnosis and Treatment

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally inadmissible except as provided by the rules of evidence or otherwise by law. *Id*. at 802. Tennessee Rule of Evidence 803(4) provides that "[s]tatements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general

character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment" are not excluded by the hearsay rule.

The trial court determined that the victims' statements were admissible as substantive evidence because they were made by the victims for the purposes of medical diagnosis and treatment. Ms. Cotten and Ms. Gonzalez testified that the victims' statements were necessary for medical diagnosis and treatment, including psychological injuries. Ms. Gonzalez explained that the information she gathered from the victims was important to ensure the safety of the victims. Ms. Cotten testified that the physical examinations were based on information Ms. Gonzalez gathered from the victims. Ms. Cotten and Ms. Gonzalez created reports for each victim based upon the information they gathered when Ms. Gonzalez interviewed the victims and when Ms. Cotten examined the victims. The victims' statements to Ms. Cotten and Ms. Gonzalez and the corresponding medical reports were admissible for the purpose of medical diagnosis and treatment and were used by Ms. Cotten and Ms. Gonzalez to support their opinions in this case. The trial court did not err by admitting the statements as an exception to rule barring the admission of hearsay. *See State v. Howard*, 504 S.W.3d 260, 278 (Tenn. 2016) (holding sexual assault victims' statements within children's advocacy center records were admissible under the hearsay exception made for the purpose of medical diagnosis and treatment). The Defendant is not entitled to relief on this basis.

### B. Confrontation Clause

The Defendant argues that the admission of the victims' medical reports violated the Confrontation Clause by "recording the victims' testimony without giving the Defendant an opportunity to cross-examine." The Confrontation Clause provides a criminal defendant the right to confront and cross-examine witnesses. *See* U.S. Const. amends. VI, XIV; Tenn. Const. art. I, § 9; *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). In *State v. McCoy*, 459 S.W.1, 13-14 (Tenn. 2014), our supreme court said that Article I, section 9 of the Tennessee Constitution placed no additional restrictions on the admission of hearsay statements beyond the limits of the federal constitution, as explained in *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Thus, the same standards apply in interpreting a defendant's confrontation rights under the state and federal constitutions. *See State v. Hutchison*, 482 S.W.3d 893, 905 (Tenn. 2016). In analyzing whether an out-of-court statement is barred by the Confrontation Clause, inquiry begins with "whether the challenged statement is testimonial." *See id.; State v. Dotson*, 450 S.W.3d 1, 63 (Tenn. 2014). The Confrontation Clause has no bearing on the admission of statements which are nontestimonial hearsay. *Hutchison*, 482 S.W.3d at 905-06 (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006)); *Dotson*, 450 S.W.3d at 63. The admissibility of a nontestimonial statement is determined by the traditional rules regarding the admission of hearsay evidence. *State v. Cannon*, 254 S.W.3d 287, 303 (Tenn. 2008); *see Davis*, 547 U.S. at 821.

In order for a testimonial statement to be admissible, the declarant must be unavailable to testify, and the defendant must have had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-55; *see Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009). The Confrontation Clause is not violated when the declarant is a witness and subject to cross-examination regarding the prior testimonial statements. *See Dotson*, 450 S.W.3d at 73; *see also Crawford*, 541 U.S. at 59, n.9; *California v. Green*, 399 U.S. 149, 162 (1970).

In this case, each victim testified, and the Defendant had the opportunity to cross-examine them extensively about their previous statements. Thus, the Defendant's confrontation rights were not violated. *See State v. Tyrone Batts*, No. M2015-01662-CC.A.-R3-CD, 2017 WL 1137110, at *5-6 (Tenn. Crim. App. Mar. 27, 2017 (holding that "there is no confrontation problem . . . because the victim testified. Thus, we do not need to consider whether her statements to [the nurse examiner] were testimonial or nontestimonial and move directly to the admissibility of evidence under [Tennessee Rule of Evidence] 803(4)"), *perm. app. denied* (Tenn. July 20, 2017). Moreover, statements in medical records given for the primary purpose of medical diagnosis and treatment are nontestimonial. *Cannon*, 254 S.W.3d at 303.

### C. Cross-Examination of Sandra Gonzalez

The Defendant also argued that the trial court erred by denying the Defendant an opportunity to cross-examine Ms. Gonzalez regarding the medical history contained in the medical reports or to make an offer of proof regarding the same. The State responds that the trial court did not err by limiting the Defendant's questioning of Ms. Gonzalez.

During cross-examination of Ms. Gonzalez, defense counsel asked Ms. Gonzalez medical questions related to the portion of L.P.'s medical report that was prepared by Ms. Cotten. The state objected, and the trial court ruled that Ms. Gonzalez could only testify regarding the portion of L.P.'s report that Ms. Gonzalez prepared.

The trial court did not err in limiting defense counsel's questioning regarding the portion of L.P.'s report prepared by Ms. Cotten. *See* Tenn. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that a witness has personal knowledge of the finding.")

### IV. Cross-Examination of Peggy Johnson

The Defendant contends that the trial court erred by allowing the State to question Peggy Johnson about Mrs. Johnson's blaming the victims for the incidents involving the Defendant and her contractual obligations as a foster parent. He argues that the State

went beyond the scope of questioning in an attempt "to paint" Mrs. Johnson in an unfavorable light regarding her responsibilities for the victims' care. The Defendant argues that the State appears to blame Mrs. Johnson for the incidents even though she was not in the home when the incidents occurred. The Defendant argues that this prejudiced his defense by creating an "untrue narrative that the couple generally did not care for the health and well-being of the victims." The State responds that the trial court did not abuse its discretion during the State's cross-examination of Mrs. Johnson. The State argues that the State sought to show that Mrs. Johnson was not credible by questioning her about her responsibilities regarding foster care of the victims and by showing that she blamed the victims for what transpired with the Defendant.

On cross-examination, the State asked Mrs. Johnson if she had a contract with a foster care agency to be a foster parent. Defense counsel objected to the relevancy of this question, and the State responded that it was relevant to the authority-figure element of the charged offenses. The trial court overruled the Defendant's objection and allowed the State to question Mrs. Johnson about her role and obligations as a foster parent. Mrs. Johnson testified that as a foster parent, she had a responsibility to protect the victims. However, she blamed "all three of them for what happened."

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence lies within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

The trial court did not err in allowing the State to question Mrs. Johnson regarding her and the Defendant's responsibilities as foster parents. Also, the questions were relevant to Mrs. Johnson's credibility and her possible motive to influence L.P. to sign an affidavit. Thus, the Defendant is not entitled to relief on this issue.

### V.     Testimony Regarding C.A.'s Character for Truthfulness

The Defendant contends that the trial court erred by refusing to allow the Defendant the opportunity to offer proof regarding C.A.'s propensity for truthfulness by asking Mr. Mulligan about specific instances of C.A.'s conduct. The Defendant argues that the State opened the door to particular incidents. The Defendant argues that he was prejudiced because the State was allowed a broader scope of questioning than the Defendant was allowed. The State responds that the trial court did not err in limiting Mr. Mulligan's testimony regarding C.A.'s character for truthfulness.

During Mr. Mulligan's cross-examination, the State objected to questions eliciting testimony about specific instances of C.A.'s conduct. The court overruled the State's objection, noting that the Defendant had not asked about any specific instances of conduct. The Defendant asked Mr. Mulligan about C.A.'s character for truthfulness, and Mr. Mulligan responded that he would "usually not" believe her. On cross-examination, the State asked Mr. Mulligan if C.A. sometimes told the truth, and he agreed that C.A. did. On redirect examination, the Defendant argued that the State had opened the door regarding specific instances of conduct. However, the court disagreed and found that the State had asked Mr. Mulligan asked about her ability to tell the truth as a general matter and did not inquire about specific instances. The Defendant asked Mr. Mulligan if C.A. would "manipulate the truth to get what she wanted?" Mr. Mulligan said that C.A. had "been known to do that." The Defendant did not request a jury-out hearing to make an offer of proof regarding C.A.'s specific instances of conduct relevant to truthfulness.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence lies within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee Rule of Evidence 608(b) states, in relevant part, that

[s]pecific instances of conduct of a witness for the purpose of attacking . . . the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness. . . . The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry; [and]

(2) the conduct must have occurred no more than ten years before commencement of the action or prosecution[.]

The record reflects that the State did not inquire about specific instances of C.A.'s conduct during the cross-examination of Mr. Mulligan. The State asked Mr. Mulligan generally if C.A. had been known to tell the truth. Mr. Mulligan did not specify any incident during which C.A. told the truth, rather, he agreed that C.A. sometimes told the truth. Moreover, Tennessee Rule of Evidence 608(b) allows counsel to ask the witness about the witness's prior acts, not the prior acts of another witness. *See State v. Dishman*, 915 S.W.2d 458, 464 Tenn. Crim. App. 1995); *see also State v. Wyrick*, 62 S.W.3d 751, 780 (Tenn. Crim. App. 2001). This was the testimony of Mr. Mulligan, not C.A. The trial court did not err by prohibiting the Defendant from inquiring of Mr. Mulligan about specific instances of C.A.'s conduct regarding her character for truthfulness. The Defendant is not entitled to relief on this basis.

## VI. Trial Court's Questioning of Peggy Johnson

The Defendant contends that, during Mrs. Johnson's testimony in the jury-out hearing, the trial judge exhibited an obvious bias against Mrs. Johnson and the Defendant. The Defendant argues that the court displayed bias when the judge became upset and pointed a finger at Mrs. Johnson. The Defendant's motion for a mistrial was denied. The State responds that the court did not err in denying the Defendant's motion for mistrial. The State explains that the issue arose during a jury-out hearing about whether L.P.'s affidavit signed two weeks before trial should be admitted as substantive evidence and that the court ruled in the Defendant's favor. The State argues that the Defendant cannot show that a mistrial was a manifest necessity because the events occurred in a jury-out hearing.

During a jury-out hearing, Mrs. Johnson testified that she took L.P. to the Defendant's lawyer to obtain a sworn statement by L.P. two weeks prior to the Defendant's trial. The record reflects that L.P. had been living with Mrs. Johnson's daughter during this time and that L.P. had no other home. Two days prior to trial, Mrs. Johnson and her daughter told L.P. that she was no longer allowed to live in Mrs. Johnson's home, rendering L.P. homeless.

Defense counsel objected during the trial court's questioning of Mrs. Johnson about the circumstances of the affidavit, stating, "I appreciate you[r] not pointing your finger at this person. She deserves respect and an impartial judge, and we've gone beyond the pale of that. I move for a mistrial." The court denied the Defendant's request for a mistrial and stated, "Let the record reflect that I pointed [my] finger, took it out, and used it in the air, and if I pointed it at her, I pointed it at her, but I'm making a point." Afterward, the trial court permitted the admission of L.P.'s affidavit as substantive evidence. The court further stated the following:

> Now, before we break for lunch, let me make this statement on the record. Outside the heat of passion of all of the attorneys a mistrial was requested during a jury-out hearing involving this issue [803(26)]. I take

-24-

everything pretty seriously as you all do and maybe you all understand and may be responsible for making a particular finding and ruling.

The jury was out and in cross-examination, my cross-examination of [Mrs.] Johnson, I raised my finger to make a point. I didn't inten[d] to degrade her, but it was my way of making a point and I felt like I needed to get to the bottom of the issue. I'm still very uncomfortable about this and this decision, but that cross-examination, that raising the finger, needs to be taken in [context] as to what I was doing at that particular time.

Further, the record is clear up to this point, there has [been] no bias, there has been no prejudice, there has been no unfairness in any ruling of the [D]efendant in this particular case.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

This incident occurred during a jury-out hearing, and the trial court ultimately ruled in the Defendant's favor by admitting L.P.'s affidavit as substantive evidence. The Defendant points to no other incident alleging bias against the Defendant or his witnesses during the trial. The Defendant has failed to show a manifest necessity for a mistrial. Thus, the Defendant is not entitled to relief on this basis.

## VII. Jury Instructions

The Defendant contends that the trial court erred in failing to instruct the jury on sexual battery by an authority figure as a lesser included offense of aggravated rape in Counts Four and Five. The State responds that the Defendant waived review of the issue by failing to request an instruction for the lesser charge of sexual battery by an authority figure and by failing to raise an objection to the jury instructions at the trial. The State also argues that the Defendant has failed to demonstrate he is entitled to plain error review and that plain error review is not warranted.

When a party fails to make a written request for a lesser included offense instruction, a trial court may still instruct a jury on the offense. *Bryant v. State*, 460 S.W.3d 513, 523 (Tenn. 2015), *overruled in part on other grounds by Moore v. State*, 485 S.W.3d 411, 421 (Tenn. 2016).

The Defendant has waived appellate review of this issue by failing to raise it at the trial. *See* T.C.A. § 40-18-110(c) (failure to request lesser included offenses waives the issue, and the issue may not be raised in a motion for new trial or on appeal). The Defendant neither objected to the trial court's proposed jury instructions nor submitted a written request for sexual battery by an authority figure to be instructed as a lesser included offense of aggravated rape. *See Bryant*, 460 S.W.3d at 523. Though the Defendant does not request plain error review, we conclude that consideration of this issue is not necessary to do substantial justice. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also State v. Minor*, 546 S.W.3d 59, 70 (Tenn. 2018). We note that the jury was provided instructions for attempted aggravated rape, rape, aggravated sexual battery, and sexual battery as lesser included offenses of aggravated rape, and it is unlikely that the jury would have returned a guilty verdict for sexual battery by an authority figure. Likewise, the jury's verdict reflects that it credited the testimony of the victims. The Defendant is not entitled to relief on this basis.

## VIII. Judgments

The Defendant's convictions and sentences in Counts One and Two were for attempt to commit sexual battery by an authority figure, but the judgment forms reflect that the convictions were for sexual battery by an authority figure.

Based upon the foregoing and the record as a whole, the judgments of the trial court are affirmed, and the case is remanded to correct the judgment forms in Counts One and Two to reflect that the Defendant was convicted of attempt to commit sexual battery by an authority figure.

_____
ROBERT H. MONTGOMERY, JR., JUDGE